AO106(Rev.5/85) Affidavit for Search Warrant

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

In the Matter of the Search of
(Name, address or brief description of person, property, or premises to be searched)

xxxxxxxxxxxxxxxxxxxxxx
Apt. xxx
Washington, D.C.

## APPLICATION AND AFFIDAVIT
## FOR SEARCH WARRANT

### CASE NUMBER:

I _____ Daniel Straub _____ being duly sworn depose and say:

I am a(n)___ Detective with the Metropolitan Police Department _____ and have reason to believe
                              (Official Title)
that ☐ on the person of or ☒ on the property or premises known as  (name, description and or location)

xxxxxxxxxxxxxxxxxxxxxx
Apt. xxx
Washington, D.C.

in the District of Columbia, there is now concealed a certain person or property, namely (describe the person or property to be searched)

SEE ATTACHED AFFIDAVIT

which is (state one or more bases for search and seizure set forth under Rule 41(c) of the Federal Rules of Criminal Procedure)

SEE AFFIDAVIT

concerning a violation of Title _18_ United States Code, Section(s) 1028 . The facts to support a finding of Probable
Cause are as follows:

SEE ATTACHED AFFIDAVIT HEREIN INCORPORATED BY REFERENCE AS IF FULLY RESTATED HEREIN

Continued on the attached sheet and made a part hereof.    ☒ YES    ☐ NO

Elisabeth Poteat
Organized Crime & Narcotics Trafficking Section
(202) 514-7067                                    Signature of Affiant
                                                  Daniel Straub, Detective
                                                  Metropolitan Police Department
Sworn to before me, and subscribed in my presence

_____         at Washington, D.C.
Date

_____         _____
Name and Title of Judicial Officer          Signature of Judicial Officer

**AFFIDAVIT**

**IN SUPPORT OF A SEARCH WARRANT**

1.        I, DANIEL STRAUB, being a duly sworn member of the Metropolitan

Police Department (MPD), Centralized Auto Theft Section, Washington, District of

Columbia DC), do affirm that I have been employed with the MPD for more than

twenty-five (25) years, having worked at least nineteen (19) years as an investigator

and then detective assigned directly to MPD's Centralized Auto Theft Section,

Special Investigations Branch.  During my tenure at MPD, I have participated in the

execution of numerous search warrants.  I have also attended many automobile theft

investigative seminars in the United States and Canada.  Many of these conferences

have incorporated sessions associated with vehicle title documents, fraud and the

schemes affiliated with the theft, sale, manufacture and exportation of automobiles.  I

have also been a member of the International Association of Auto Theft Investigators

(IAATI) and serve on the Washington Metropolitan Area Council of Governments

(COG), Chiefs of Police Auto Theft Sub-Committee.

2.        During the course of my investigative experience, I have worked with

federal, state and local law enforcement agents in the field of vehicle theft.  Since

1995, I have provided court testimony as an expert witness in this area for the United

States Attorney's Office for the District of Columbia.  Your affiant has also had

occasion to investigate criminal matters within the DC Department of Motor Vehicles

(DMV), particularly those that have evolved from fraudulently titled automobiles.  I

am familiar with the DC DMV, its operations, organization, the operation of its (car)

dealer office, the procedures outlined for car dealers who are licensed to operate

within the District of Columbia, and the documents, forms and procedures associated

with the titling and registration of motor vehicles.


3.      Your affiant is also versed in the fraudulent use and counterfeit production of

documents that are often linked with the individuals who perpetuate the mobility of

unregistered and sometimes stolen motor vehicles.  These documents have included,

but are not limited to temporary use tags, license plates (whether of metal or other

construction), that are designed to appear authentic, but are color reproductions or

otherwise crafted to appear genuine.


4.      Affiant makes this affidavit in support of an application for the issuance of

a search warrant to search for fruits, evidence and instrumentalities of criminal

activity located at the following address, an apartment building and a specific unit

located within that structure that is leased by an individual hereinafter known as

Frank Walker, the tenant, of xxxxxxxxxxxxxxxxxxxxxxxx, Washington, D.C.  The

description of the property is provided (Attachment A) together with verification in

the form of a lease agreement for said apartment (Attachment B).


5.      On/About December 6, 2006 law enforcement agents investigating a

criminal complaint secured and executed a search warrant for the identical address

enumerated in Paragraph (4). That search warrant, incorporated herein and referenced in Attachment C, was sought in the aftermath of a firearm investigation.

6.        Law enforcement personnel had a separate search warrant for an automobile that was being operated by Frank Walker. The car was situated nearby at the time of the apartment's search, and found to be displaying a metal (car) dealer's license plate of DLR-5017. The car dealership linked to the dealer's tag, identified as K & F Auto Sales, located at xxxxxxxxxxxxxxx, Washington, D.C. is owned by Frank Walker, according to records on file with the DC Department of Motor Vehicles.

7.        Search of the efficiency apartment and the vehicle resulted in the recovery of numerous articles of questioned property, to include:

a)   Several dozen sets of counterfeit Virginia temporary tags with corresponding registrations, many in sequential numerical order, and most wrapped inside folded newspaper;

b)   Several suspected counterfeit Maryland driver's licenses, along with others from the states of Pennsylvania, Florida, Ohio, and the District of Columbia;

c)   Numerous counterfeit Maryland temporary tags, most exhibiting sequential numbers;

d)   At least two dozen blank Virginia registration documents bearing the imprinted names of Woodbridge Public Auto Auction;

e)   More than one dozen blank Virginia registration documents bearing the imprinted name King's Auto Inc.;

f)   Several blank Virginia re-assignment forms, all bearing the same serial number;

g)  Three (3) packs of "Trim Brite" prisma silver-colored tape;

h)  At least eighty-five (85) blank, serialized Maryland temporary registrations;

i)  Sixteen (16) sheets containing multiple counterfeit adhesive strips bearing the distinctive Maryland motor vehicle administration security hologram;

j)  Five (5) sheets containing multiple adhesive strips with the "State of Maryland" holographic logo;

k)  One (1) auction access card number issued to Amir Hassanzadeh of K & F Auto Sales, Inc., xxxxxxxxxxxxxxx, Washington, DC 20018;

l)  Fifteen (15) yellow and blue color photocopies, actual size, of DC dealer license plates including two of DLR-5017.

m)  One (1) paper cutting board;

n)  One (1) two-hole punch;

o)  One (1) pair of scissors; and

p)  One (1) single hand-held punch.

While inside Frank Walker's apartment, investigators seized a firearm, ammunition, ammunition magazine, stun gun, marijuana and ecstasy pills.  Also observed inside the apartment but not seize were at least two (2) portable laptops, one(1) printer/scanner/copier machine and digital cameras.

7.      Based upon the articles retrieved from Frank Walker's apartment and vehicle, and prior knowledge that the same Frank Walker was the proprietor of an automotive used car dealership business, identified as K & F Auto Sales, Inc., also located within the confines of the District of Columbia, investigators secured a search

warrant for that premises (Attachment D).  That search warrant was served on

December 6th, 2006 and yielded:

a)   An envelope with "Flip" written on the outside, containing a passport-style color

photograph of a male subject, a hand-written note in blue ink with a name, date of

birth, height, weight and signature, address and driver's license number; and a

counterfeit DC driver's license bearing all the same information in a concise text

format.

b)   A counterfeit Maryland temporary tag registration document. The document has a

bar code that is supposed to correspond to the actual tag number that is displayed on

its face.  When analyzed, the bar code reflects that of a different tag number but is the

same as the bar coded analyses from other counterfeit Maryland registration

documents seized from the apartment/vehicle described herein.


8.        Based upon business records on file with the District of Columbia

Department of Motor Vehicles, Dealer Section, K & F Auto Sales, Inc. is located at

xxxxxxxxxxxxxxx, Washington, District of Columbia.  The dealership trade name is

Walker Enterprises and is owned by Frank Walker, Social Security Number xxxxxxx-

8327 of (Residential Address) xxxxxxxxxxxxxxx, Washington, D.C.


9.   Based upon these facts, it is the affiant's assessment that there is probable cause

to believe that materials consistent with those that were discovered within the

residential dwelling belonging to Frank Walker and are associated with the sale,

registration and titling of motor vehicles, and production of counterfeit driver's

licenses such as those also found to be present within his apartment, vehicle and

business and are capable of being produced through the use of electronic equipment

consistent with those items that were observed inside the apartment located at

xxxxxxxxxxxxxxxxxxxxxxxx, Washington, DC.  In conjunction with said items, it is

also known that the street value of counterfeit materials such as temporary tags and

driver's licenses can be $150 to $3,000 (U.S.).  Your affiant also believes from prior

experience that documents and other forms of electronic or printed records relating to

customers, clients, and financial notations may be located at xxxxxxxxxxxxxxxx in

Washington, D.C.  This affidavit seeks authorization for a search and seizure warrant

for the given location described in Attachment A on the grounds that there is probable

cause to believe that they contain evidence, fruits and instrumentalities of violations

of the laws of the United States of America.  A complete description of the articles to

be seized is included in Attachment E.

---

DETECTIVE DANIEL STRAUB
METROPOLITAN POLICE DEPARTMENT
WASHINGTON, D.C.

SUBSCRIBED AND SWORN BEFORE ME
ON THIS _____ DAY OF _____, 2006

---

JUDGE, UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

**Attachment 'A'**
**<u>Location to be Searched</u>**


**xxxxxxxxxxxxxxxxxxxxxxxxxxxxx, WASHINGTON, D.C.**

The premise xxxxxxxxxxxxxxxxxxxis described as a high-rise apartment complex located on the west side of xxxxxxxxxxxxxx, at the corner of xxx and xxxxxxxxxxxxxxx, xxxxxxxxxxxx, Washington, DC. The words "The xxxxxxxxxxxxxx" are displayed in white letters on a green awning over the front entrance of the apartment complex. The front door of APARTMENT xxx is green with green numerals xxx, affixed to a white oval placard near the top center of the door. Your affiant submits that the aforementioned location is the residence of FRANK BERNARD WALKER.

**Attachment 'E'**
**Items to be Seized**

1.  Any and all receipts, notebooks, ledgers, accounting books, money orders, electronic wire transfer documentation, cashiers checks and traveler's checks.

2.  Any and all bank statements, records, documentation of bank accounts (closed or in use), deposit slips, withdrawal slips, passbooks, checkbooks, check registers, investment statements, credit cards, credit card accounts in the name of Frank Walker or any other name, stock or mutual fund purchases, statement or receipts, currency, automatic teller machine (ATM) receipts and electronic money transfers.

3.  Any and all documentation pertaining to the sale, purchase, trade or possession of any motor vehicle.

4.  Any and all telephone and pager records to include, but not limited to, billing statements, toll records, air time records, and cellular or mobile telephone billing statements, caller identification logs.

5.  Any and all documents relating to the identity of co-conspirators or clients, including, but not limited to, address, phone books, Rolodexes, personal telephone directories, photographs, video, audio, CD, disk or DVD's, correspondence between co-conspirators, computer files and other electronic data storage.

6.  Any and all items either forged or fraudulently obtained instruments or instrumentalities used to produce the same, including but not limited to, drivers and non-drivers licenses, camera copy document forms, DMV registration certificates, registration license tags, digital or Polaroid camera(s), any film, decals for license plates and any lamination equipment.

7.  Computer equipment, including computer hardware, computer software, scanners or printers, computer or electronic storage media, computer disks, and computer printouts.  The search procedure for the electronic data contained in computers or operating software or memory devices, whether performed on site or in a laboratory, or other controlled environment, will include the following techniques:

    a)  surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain a pertinent file);
    b)  "opening" or cursorily looking at the first few "pages" of such files in order to determine their precise contents;
    c)  "scanning" storage areas for deliberately hidden files; and
    d)  Performing key word searches through all electronic storage areas to determine the existence of stored records relating to customers, clients or other associates.

# ATTACHMENT 'A'

**Attachment 'A'**
**Location to be Searched**

████████████████████████             **WASHINGTON, D.C.**

The premise ████████████████ is described as a high-rise
apartment complex located on the west side of ████████████, at the corner of ████
and ████████ are displayed in white letters on a green awning over the front entrance of the
apartment complex.  The front door of APARTMENT ████ is green with green numerals
████ affixed to a white oval placard near the top center of the door.  Your affiant submits
that the aforementioned location is the residence of FRANK BERNARD WALKER.

# ATTACHMENT 'B'

**THE ENVOY**
**LEASE AGREEMENT**

THIS LEASE AGREEMENT, made this **14th** day of **April, 2006**, by and between ENVOY ASSOCIATES LIMITED PARTNERSHIP, herein called the Landlord, and **Frank Walker** the Resident.

**WITNESSETH:**

That for and in consideration of the covenants, conditions and agreements herein contained, and in consideration of the rent hereinafter reserved and agreed to be paid, and in further consideration of the representations of the Resident made in the written application executed by the Resident and delivered to the Landlord, the parties do hereby agree and covenant as follows:

**1. Premises/Term.** The Landlord does hereby grant, demise and lease to the Resident, and the Resident does hereby take and lease from the Landlord, the premises known as Unit No. ███ ("Premises") located in The Envoy Condominium located at ██████ ██████ Washington, D.C. (the "Building" or "Condominium premises are to be occupied by **Frank Walker** as a private dwelling for residential purposes only and not otherwise, and for a term of **12** months, commencing on the **1st** day of **May 2006** ("Commencement Date") and ending on the **30th** day of **April 2007** (referred to together with any extensions or renewals or holdovers as the "Lease Term").

**2. Rent.** Resident shall pay as Rent the following amounts: **(a) Premises Rent.** Resident shall pay for the Premises the annual rent of **Eight Thousand Two Hundred Eighty and  00/100** Dollars **($8,280.00)** which shall be payable in **12** monthly installments as follows: **Seven Hundred Fifteen and 00/100 ($715.00)** Dollars per month during the period **May 1st, 2006** through and including **April 30th, 2007** and (without further notice) **N/A** Dollars **(N/A)** per month during the period **N/A** , **N/A** through and including **N/A** , **N/A**.

Each monthly installment of rent is payable in advance on the first day of each month, without set-off, deduction, or demand, at the Rental Office on the first floor of The Envoy or at such other place as designated by the Landlord.

(2) The first monthly payment of rent in the amount of **Seven Hundred Fifteen and 00/100 ($715.00)** is to be made upon execution of this Lease as rent in advance for the first full month of said term.

(3) It is further agreed that Resident is taking possession of the leased premises for a partial month, commencing on **April 14, 2006** ending on **April 30, 2006** and that pro-rated rent for that partial month is **$405.17** Dollars which is due on **May 1, 2006**. Thereafter, monthly rent is payable as provided in paragraph 2 (a) (1) above. **b) Delinquent Payments.** For each monthly installment of Rent not paid in full within seven (7) days of the date when due, Resident shall pay to Landlord a service charge of **Five Percent (5%) (Of your monthly installment of Rent)** for the purpose of defraying the expenses incident to handling delinquent payments. This provision or the payment by Resident of a late fee hereunder is not a waiver by Landlord of Resident's obligation to pay rent on the first day of each and every month.

**(c) Returned Checks.** In the event that any check used in payment of Resident's Rent is returned by the bank for any reason other than a bank error, Resident agrees to pay to Landlord an additional charge of **$30.00** to defray the costs resulting from the reprocessing of the payment, which shall be added to the Rent due as Additional Rent. Such Rent is due and payable immediately upon receipt by Resident of Landlord's notice that the payment check was not honored. If Resident's personal check is returned by the bank, Landlord may, at his sole discretion, require that any and all future payments due be made by certified check, cashier's check or money order.

**(d) Notwithstanding** the foregoing or anything in this Lease to the contrary, Resident agrees to pay as additional rent during the initial 12 – month term of this Lease and thereafter such additional sums, if any, as Landlord may be permitted to charge, from time to time, under any applicable Federal or District of Columbia legislation or in the absence of any legislation (including, without limitation, any rent control law) such additional sums as Landlord in its sole and absolute discretion may determine. Any notices of increases pursuant to the foregoing sentence shall be in conformity with the applicable Federal of District of Columbia legislation.

**3. Security Deposit.** Resident has deposited with Landlord a security deposit in the amount of **$370.00(transfer security deposit)** or the performance of each and every covenant and agreement of this Lease ("Security Deposit"). Landlord shall have the right, but not the obligation, to apply the Security Deposit in whole or in part in payment of any unpaid Rent or other amount due because of the unperformed or breached covenant or agreement by Resident hereunder. Landlord's right to possession of the Premises for nonpayment of Rent or for any other reason shall not be affected by the fact that Landlord holds the Security Deposit. Resident's liability is not limited to the amount of the Security Deposit. On termination of this Lease and Resident's occupancy hereunder, and full payment of all amounts due and performance of all Resident's covenants and agreements (including surrender of the Premises in accordance with Paragraph 19), the Security Deposit or any portion thereof remaining unapplied shall be returned to the Resident with interest, to the extent required by law. It is expressly understood that the aforesaid Security Deposit shall not be applied by Resident toward payment of Rent for any month during the Lease Term or any renewals or extensions thereof and that Resident shall pay Rent for the last month of the Lease Term promptly on the first day of such month.

**4. Resident's Application and Representations.** It is Resident's obligation under this Lease to have provided Landlord with full and accurate information. In that regard, the application for this Lease and all representations, agreements and warranties contained therein are hereby made a part of this Lease. Resident warrants that information given in the application is true in all respects.

aforesaid writing.

(b)  Resident covenants and agrees that **Resident shall take good care of the Premises** and the fixtures and equipment therein, that all appliances furnished will be kept in a clean and slightly condition, that Resident will not suffer or commit any waste matter about the Premises or the common areas of the Building, and upon expiration of said Lease Term, or upon surrender or abandonment of the leased Premises will leave said Premises in as good condition as when first occupied by the Resident, ordinary and reasonable wear and use excepted but without modifying Resident's obligations hereunder.  **Resident agrees to pay for all necessary repairs to said Premises, or to the equipment or appliances therein, caused by the negligence or misuse of the Resident**, Resident's family, employees, agents, invitees, guests, licenses or other occupants of the leased Premises.  Resident agrees to replace at Resident's expense all commonly replaceable elements used in fixtures and appliances, such as light bulbs.

(c)  If Resident fails to keep Premises in such condition and repair, Landlord may, upon such notice as may be required by law, if any, enter and put the Premises in good condition and repair, and upon demand, Resident shall pay to Landlord the cost of any such work.  Landlord shall be entitled to apply the Security Deposit to any such costs.  **Resident shall be responsible for all damages to the Premises, Building or common areas caused by overflow of drains or plumbing resulting from improper use of fixtures.  All personal property located or stored in the Premises shall be kept and stored at Resident's sole risk.**

(d)  The water closets (commodes) and other water and sewer and sanitary apparatus and fixtures shall not be used for purposes other than those for which they have been designed.  No sweepings, matches, rages, ashes, diapers (including "disposable" diapers), or other improper articles shall be thrown therein.  **The cost of repairing any damage (including that to any property of others) resulting from the misuse of the same shall be borne by the Resident of the Premises.**  Resident further agrees to keep all tubs, showers and sinks properly caulked and to pay the cost of any water damage which occurs as a result of improper caulking or the failure of Resident to perform Resident's obligation hereunder.

(e)  Resident further covenants and agrees that prompt written notice of any defect of said Premises or in any of the equipment, appliances or parts thereof will be given to Landlord as soon as the same may come to the Resident's attention.

7.  **Holdover.**  Upon the expiration of the original term of this Lease Agreement by a lapse of time, the **Resident shall automatically become a Resident on a month-to-month basis at the same rental rate in effect at the date of the expiration or at a new month-to-month rental rate set by the Landlord** and under the same terms, covenants and conditions as were contained in this original Lease Agreement and any addition thereto.  If the Landlord desires to increase the Resident's rent from the rate in effect at the expiration of the original term, effective at or after the expiration of the original term of this Lease Agreement, thirty (30) days prior written notification of such increase shall be made by the Landlord to the Resident.  It is further understood and agreed that any such notice of rent increase effective at or after the expiration of the original term of this lease, or given to a month-to-month Resident, shall become automatically effective and legally binding upon the Resident by his/her continuing to remain in the Premises as of the effective date of such rent increase as provided in the notice, whether or not such Resident shall have communicated to the Landlord assent or dissent to such rent increase, in writing or otherwise.  **Notices of rent increases issued by the Landlord shall be in conformity with any applicable statute both as to form and content.**  To the extent that the requirements of any such statute shall be inconsistent with the foregoing requirements with respect to increases, such statutory provisions shall prevail and be substituted for the foregoing provisions to the extent of any such inconsistency.  With respect to the termination of such month-to-month tenancy, the Resident shall give to the Landlord at least thirty (30) days prior written notice of any intention to remove from said Premises.  Said notice must be given so that the tenancy terminates on the last day of a calendar month.

8.  **Liability of Owner/Landlord.**

(a)  To the extent permitted by law, and after control of the Condominium is transferred to any Condominium Association, Landlord and the owner of the Premises ("Owner") shall not be liable or responsible for damages sustained by the Resident or anyone claiming by, through or under Resident resulting from action or inaction of the Condominium Association, the management agent of the Condominium or any of their agents or employees, whether negligent or otherwise, or for the failure of any of them to provide heat, electricity, water, sewer or other services or to repair or maintain the aforementioned items. Landlord agrees to use its reasonable efforts to obtain from the Condominium on behalf of the Resident, upon request, all services to which the Owner is entitled as Owner of the Premises.

(b)  To the extent permitted by law, neither the Owner of the unit nor the Landlord hereunder, any of their agents or employees shall be liable to Resident or anyone claiming by or through the Resident for personal injury or damage or loss damage, theft, or destruction of property for any reason whatsoever arising out of or related to this Lease or Resident's occupancy hereunder. Notwithstanding the above, nothing herein shall relieve Owner or Landlord of the consequences of their own gross negligence or willful misconduct.

9.  **Use of the Apartment.  The Premises shall be occupied solely for residential purposes by the Resident and those persons listed on the application of this Lease, including children.**  Neither Resident nor any of such persons shall perform or permit any practice that may damage the Premises, any part of the \building, or the common areas, the reputation of or otherwise be injurious to the Building or the neighborhood, be disturbing to other occupants of the Building, increase the rate of insurance on the Building, or be in violation of local laws and ordinances or the Condominium Declaration, Bylaws, or Rules and Regulations adopted by the Condominium.

10.  **Assignment and Subletting.**  Resident shall neither sublet the Premises nor any part thereof nor assign this Lease nor permit, by any act or inaction, any transfer of Resident's interest by operation of law or otherwise, nor offer the Premises or any part thereof for lease or sublease or permit the same to be occupied except as provided for within without, in each case, the prior written consent of the Landlord.  Landlord may, at its sole discretion, grant or withhold such consent.  **Acceptance by Landlord of payment from a person other than the Resident, whether same is made by an authorized occupant of the premises or not, shall not constitute nor be**

due hereunder for the entire term or if Landlord shall recover possession subsequent or pursuant to legal process, then upon the happening of any such events, Landlord shall have the right, at its option, to take possession of the Premises and relent the same for the Resident and apply the proceeds received from such relating toward the payment of Rent and other amounts due or to become due from Resident under this Lease. Such re-entry and reletting shall not discharge Resident from liability for Rent and other amounts due to date of such retaking and for any loss of Rent and other amounts due sustained by the Landlord in respect to the balance of the term. Any such loss of Rent and other amounts due for the balance of the Lease Term shall be payable monthly by the Resident in advance in the same manner that Rent and other amounts due hereunder are to be paid except as set forth herein below. Landlord shall have the right to recover any such loss of Rent and other amounts due monthly whether or not said Premises have been relet. Resident shall further be liable for the reasonable cost of cleaning and redecoration of the Premises. No re-entry by the Landlord, and no acceptance by the Landlord of keys from the Resident, shall be considered as a waiver of any of the Resident's obligations under this Lease. Landlord may retain all payments received by Landlord upon such rerenting of the Premises regardless of whether such payments exceed the monthly Rent and other amounts payable by Resident. Notwithstanding whether Landlord relets the Premises, Landlord shall have the right to demand and receive from Resident: (a) the sum of all expenses which will be necessary to relet the Premises, plus immediate payment of all unpaid monthly installments of Rent and other amounts due for the entire scheduled term of this Lease, less (b) the fair market rental value of the Premises as of the time of such demand, as determined by Landlord.

**13. Rights of Owner upon Default.** Should Resident at any time during the continuance of occupancy of the Premises fail to pay any one of the monthly installments of Rent and other amounts as aforesaid when and as the same shall respectively become due and payable, although no demand may have been made for same, or should the Resident violate any of the agreements, terms, covenants or conditions of this Lease, or any rules and regulations herein or hereinafter adopted by the Landlord (including, but not limited to, the Declaration, Bylaws and Rules and Regulations of the Condominium), the Landlord shall have the right and option to terminate this Lease and re-enter and take possession of the Premises forthwith, by legal process from the court having jurisdiction over the Premises. No payment by Resident or receipt by Landlord of a lesser amount than the monthly installments of Rent and other amounts herein stipulated shall be deemed to be other than on account of the earliest stipulated sums due and payable nor shall any endorsement or statement on any check or any letter accompanying any check or payment as Rent be deemed an accord and satisfaction, and Landlord may accept any check or payment without prejudice to the Landlord's right to recover the balance of such Rent and other amounts or pursue any other remedy provided in this Lease or by law. All rights and remedies of Landlord under this Lease shall be cumulative and shall not be exclusive of any other rights and remedies provided to Owner under applicable law. **IN THE EVENT OF A DEFAULT HEREUNDER, EITHER IN THE PAYMENT OF RENT OR OTHER AMOUNTS DUE HEREUNDER, SUCH DEFAULT SHALL OPERATE AS A NOTICE TO QUIT, THE USUAL 30-DAY NOTICE TO QUIT BEING EXPRESSLY WAIVED.**

**14. Alterations, Additions, Fixtures and Appliances.**

(a) Resident will not paint, wallpaper or otherwise alter the Premises or install fixtures (except for interior window coverings), major appliances or devices (including heating and air conditioning devices) of any kind without in each case obtaining the prior written consent of Landlord, and on the terms and conditions specified in such written consent. If Resident fails to do so, Resident agrees to pay Landlord the reasonable cost of repairs or replacement to restore the Premises to their original condition. All alterations, additions and fixtures (including locks and bolts and window coverings, but excluding draperies and curtains) shall remain as part of the Premises unless Landlord in writing otherwise elects.

(b) No additional locks shall be placed on any doors of the Premises unless written permission is obtained from the Landlord and a duplicate key is provided to the Landlord. Upon termination or surrender of this Lease or the demised Premises, the Resident shall surrender to the Landlord all keys to the leased Premises and to the mailbox. The Resident shall pay the Landlord reasonable replacement cost of lost keys or for keys not surrendered as aforesaid.

(c) Resident, with the prior written consent of the Landlord, may install, within the leased Premises, burglary.

(d) Without waiving Resident's obligation to secure consent pursuant to subparagraph (a) hereof, if Resident affixes wallpaper, or any other type of wall-covering, including paint, to any or all of the walls or ceilings of the Premises, Resident shall, before vacating the Premises for any reason whatsoever, remove all such wallpaper or wall covering at Resident's expense, and shall in all events restore such walls and ceilings to the same condition, color and texture as of the date of execution hereof, unless directed by Landlord in writing to the contrary. If Resident fails to do so, Resident shall be obligated to pay to the Landlord the full cost of restoring such walls and ceiling to their original condition, and Landlord, at its option, shall be entitled to apply the Security Deposit to any such costs.

**15. Access, Inspection and Repair.** The Landlord, Landlord's agent(s) and any other person authorized by the same shall have the right, upon reasonable notice, of free access to the Premises (a) at any time during the Lease Term to inspect, alter or improve the Premises or other parts of the Building, (b) at any time within ninety (90) days prior to the end of the Lease Term to exhibit the Premises for rent, and (c) at any time during the Lease Term to Resident to exhibit the Premises or Building for sale, all without interference of any kind and regardless of consent by the Resident or others. Landlord shall have the right to retain and use passkeys to the Premises in the exercise of Landlord's rights and obligations under this Lease. Resident shall not interfere with Landlord's rights as set forth in this Paragraph 15 in any manner. The reasonable exercise of Landlord's rights shall not be deemed an eviction or disturbance of Resident's use and possession of the Premises and shall not render Landlord liable in any manner to the Resident. The reasonable notice required herein is satisfied if Landlord uses its reasonable efforts to notify Resident even if actual notice is not received. **Notwithstanding the above, no notice need be given to Resident in emergency circumstances or when access is necessary to make repairs.**

**16. Utilities.** Neither Landlord nor the Condominium shall be responsible for nor shall pay for any utility services which are separately metered or billed to the Premises. Resident shall promptly pay during the Lease Term, including any extension, renewal or

the Rent shall be abated and prorated from the date of the fire, explosion or other casualty to the date the Premises again become Residentable, provided that during such repairs Resident has vacated the Premises and removed Resident's personal property, if required by the Landlord. The date of Residentability shall be the date set forth therefor in the notice to Resident that the Premises are ready for occupancy.

**19. Surrender of Possession.** At the termination of this Lease by lapse of time or otherwise, or at the termination of Resident's right to possession, Resident shall yield up immediate possession to the Landlord, as provided herein, remove all Resident's personal property therefrom and deliver all keys to Landlord at the place where Rent is payable. It is understood and agreed that if the Resident moves out, or abandons the demised Premises, or is dispossessed thereof, voluntarily or involuntarily, and fails to remove any personal property from the Premises, the Building or from the common areas of the Condominium prior to such move-out, abandonment or dispossession, then, in that event, any such personal property of any kind whatsoever, found upon the Premises shall be deemed abandoned by the Resident and shall at the Landlord's option become the property of the Landlord, who in any event shall not be liable to the Resident for its loss, destruction or damage thereto. Resident shall be liable to the Landlord and/or the Condominium, as applicable, for any and all damage Resident may cause to the Premises, the Building or the common area of the Condominium as a result of such move-out, abandonment or dispossession.

**20. Resident's Obligation to Pay Rent/No Waiver of Default.**

(a) Resident's obligation to pay Rent and other amounts due during the Lease Term shall not be waived, released or terminated by the service of any statutory notice, demand for possession, notice of termination

(b) The payment or receipt of Rent or other amounts due shall not waive or affect any such notice, demand, suit or judgment or in any manner waive, affect, change, modify or alter Landlord's rights and remedies.

(c) No waiver of any breach of the covenants, conditions or provisions hereof shall be constructed as a waiver of the covenant itself or of any future breach; the acceptance by Landlord and Resident, subject to the restrictions set forth in Paragraph 10 of this Lease.

**21. Subordination.** This Lease and any extension thereof shall remain subject and subordinate to all present and future mortgages or deeds of trust or ground leases affecting the Premises, the Building, or the land upon which the Building is located, and to all advances upon the security of such mortgages. In the event that Resident shall at any time and from time to time receive a notice from the mortgagee of the exercise of its rights under any such collateral documents, Resident shall comply with any such notice. Should Resident fail to do so, Resident hereby irrevocably appoints Landlord as Resident's attorney-in-fact to execute those instruments for and on behalf of Resident. Such power of attorney shall be coupled with an interest and shall be irrevocable. No convenant of quiet enjoyment, express or implied, is included in this Lease.

**22. Legal Expenses.** Resident shall pay Landlord's costs and expenses, **including actual attorney's fees awarded by the court,** incurred by the Landlord in enforcing or attempting to enforce the Resident's covenants, agreements, and obligations under this Lease.

**23. Binding of Heirs.** All covenants and agreements in this Lease shall be binding and inure to the benefit of the heirs, executors, administrators, successors, and assigns of the Landlord and of the Resident, subject to the restrictions set forth in Paragraph 10 of this Lease.

**24. Rights of Owner's Agent(s).** All rights and remedies of the Owner under this Lease may be executed by the Owner or by the Owner's agent(s), the Landlord hereunder, from time to time and all legal and equitable proceeding for the enforcement of any such rights and remedies may be commenced and prosecuted to final judgment and execution by the Owner or Landlord.

**25. Parking and Storage.**

(a) Landlord, at its option and sole discretion, may give Resident the right to use a Parking Space on the premises for an additional charge from time to time determined by Landlord. The use by Resident of any parking space shall be subject at all times to the terms of and in compliance with the Declaration, Bylaws and Rules and Regulations. The Rules and Regulations are attached hereto and incorporated herein by reference. Resident's right to use the Parking Space shall continue during the Lease Term set forth in this subsection **so long as Resident is not in default hereunder. Resident hereby waives any claims to use of said Parking Space in the event of any default in payment or otherwise.**

(b) Landlord, at its option, may give Resident the right to use a Storage Space in the Building. **Neither Landlord nor the Condominium shall be liable for loss or damage to any articles of personal property placed by Resident in the storage space, the presence of all such personal property being at the sole risk of the Resident.** The use by Resident of any storage space shall be subject at all times to the terms of and in compliance with the Declaration, Bylaws and Rules and Regulations.

(c) **Parking of motor vehicles on landscaped or grass areas or in any paved area not marked with parallel parking lines is strictly prohibited.** Parking or storage of trucks, campers, boats and trailers is also prohibited. Any trucks, campers, boats and trailers parked may be towed at the owner's expense. Any unlicensed motor vehicle or vehicles not bearing current registration license plates may be towed from the parking area at the owner's expense. The Resident covenants and agrees to comply with this provision, and it is understood and agreed that all such vehicles aforesaid, other than passenger automobiles bearing current registration plates, will be towed away from such parking areas at the owner's expense.

**26. Pets. Resident shall not keep pets of any kind on the Premises without prior written permission from the Landlord, said permission to be granted at Landlord's sole discretion.**

**27. Radios and T.V.** Resident shall not suffer or permit radios, television sets, record players, stereo and hi-fi or musical instruments in the Premises to disturb other occupants of the Building or the neighborhood at any time. No radio or television installation

damages, by abatement of rent or otherwise, or relieve Resident from performance of Resident's obligation under this Lease.

29. **Insurance.** Resident shall do nothing and permit nothing to be done that will contravene any fire or other insurance policy covering the Premises. If Resident's use or occupancy of the Premises increases the premium on any fire or other insurance policy, Resident shall pay for the increase on the next succeeding day when Rent is due hereunder. **Landlord recommends that Resident obtain and maintain during the Lease Term, liability insurance against all claims on account of personal injury and property damage for which Resident may become liable as a result of the use or occupancy of the Premises or the facilities and common areas of the Building.** All personal property placed in the Premises or used in the Building, Storage Space, parking areas or any other portion of the Building shall be, as noted above, **at the sole risk to Resident or the party or parties owning same.**

30. **Miscellaneous.**

(a) These captions and headings herein are for convenient reference only and in no way define or limit the scope or content of this Lease or affect its provisions.

(b) This Lease embodies the final and entire agreement and understanding between the parties, and supersedes all prior negotiations, agreements, and understandings. Neither Landlord nor Resident nor their agents shall be bound by any terms, conditions, statements, warranties or representations, oral or written, not herein contained.

(c) Feminine or neuter pronouns shall be substituted for the masculine, and the plural substituted for the singular in any place herein in, which the context may so require.

(d) Resident shall acknowledge and recognize as Landlord any assignee or transferee of this Lease.

(e) In the event that any provision of this Lease shall be unenforceable, such provision shall be deemed excluded from this Lease and the unenforceability shall not affect the validity of the remaining provisions of this Lease. **The provisions of this lease are severable, and the invalidity or unenforceability of any provision of this Lease shall not affect or impair any other provision.**

(f) Landlord's rights and remedies under this Lease are cumulative. The use of one or more thereof shall not exclude or waive any other right or remedy.

(g) **If more than one person constitutes "Resident" each is jointly and severally responsible for each and every provision in this Lease and is, therefore, not just responsible for a proportionate part of each obligation under the Lease.** In the event that one such person, due to vocational transfer, marriage or otherwise, desires to be replaced with another, prior written permission of the Landlord or Agent must be obtained, which consent may be withheld by Landlord at its sole and absolute discretion without relieving remaining persons of their obligations hereunder.

(h) Submission of this instrument to Resident shall not bind Landlord in any manner, and no lease agreement or other obligation of Landlord shall arise until this instrument is signed by Landlord and delivered by Landlord to the Resident.

(i) Resident's obligation to pay Rent and other amounts hereunder or under any extension hereof or holdover tenancy shall not be waived, released or terminated by reason of any notice by Resident of Resident's exercise of any statutory rights of first refusal.

31. **Landlord and Owner not Liable for Conditions Beyond Control.** In no event shall Landlord be required to carry out any of its obligations under this Lease nor be liable for any loss or damage for failure so to do nor shall the Resident be released from any of its obligations hereunder where such failure arises from or through Acts of God, strikes, labor difficulties, explosions, accidents, riots, civil commotions, acts of war, fire and casualty, legal requirements or causes beyond the reasonable control of Landlord.

32. **Construction.** Notwithstanding anything herein to the contrary, this Lease shall be governed by and construed in accordance with the applicable laws of the District of Columbia.

33. **Condominium Status.** Resident acknowledges that the Premises being rented is a condominium unit in The Envoy Condominium and that the Premises and this Lease are subject to a certain Declaration of The Envoy Condominium and Bylaws of The Envoy Condominium, dated February 2, 1983, recorded May 14, 1983 as Instruments No. 10431 and 10432, respectively, among the Land Records of the District of Columbia, as amended (the "Declaration" and "Bylaws"), and Rules and Regulations adopted from time to time by the Condominium pursuant to its authority under the Declaration and Bylaws ("Rules and Regulations"). Resident agrees that the tenancy created hereunder is subject to the following additional provisions.

(a) Resident shall have the right to use any limited common elements appur Resident to the unit (for which purposes of this Lease shall be deemed part of the Premises), and the non-exclusive right to use the Condominium common elements in common with other occupants of the Condominium. **Resident affirmatively agrees to abide by all of the obligations, covenants and restrictions imposed upon occupants by said Declaration (except for the payment of assessments and other monetary obligations required of unit owners), the Bylaws and the Rules and Regulations, all as may be amended from time to time.** Any violation by Resident of said obligations, covenants, restrictions, Rules and Regulations and Bylaws shall be deemed a breach of the Lease. Resident hereby permits the Condominium and its agents to proceed directly against Resident for any breach by Resident of any of said obligations, covenants, restrictions, Rules and Regulations and Bylaws including, without limitation, the power to terminate the Lease or to bring summary proceedings to evict Resident in the name of the Landlord upon forty-five (45) days prior written notice to Landlord.

(b) Resident hereby agrees to indemnify Landlord and the Condominium for any loss, cost, damage or expense (including legal and accounting fees) incurred by Landlord or Condominium directly or indirectly as a result of Resident's breach of its obligation as set forth herein.

34. **Receipt of Lease and Attachments.** (a) Resident acknowledges that he/she has read and agrees to comply with the provisions contained in this lease, including the Rules and Regulations attached hereto and incorporated herein by reference, and has received an executed copy of this lease agreement and Sections 101, 106 and Chapter 3 of the D.C.M.R. 14 (Housing), which are made a part hereof. (b) Resident acknowledges receipt of the Disclosure of Information on Lead-Based Paint and/or Lead-Based Paint Hazards

# ATTACHMENT 'C'

*D6CCWSLD3805*

# SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## SEARCH WARRANT

TO: Chief of Police of The Metropolitan Police Department or Any Other Law Enforcement Official.

(Specific law Enforcement Officer or Classification of Officer of the Metropolitan Police Department or other Authorized Agency)

AFFIDAVIT, herewith attached, having been made before me by __ATF Special Agent Aaron Ybarra of the ATF - HIDTA Task Force__ that he has probable cause to believe that in the ☐ person, ☒ premise, ☐ vehicle ☐ object known as ▬▬▬▬▬▬▬ **APARTMENT** ▬▬▬▬▬▬ **WASHINGTON, D.C. is described as a high-rise apartment complex located on the west side of** ▬▬▬▬▬▬▬ **at the corner of** ▬▬▬▬▬ **and** ▬▬▬▬▬▬▬ **Washington, D.C. The words "**▬▬▬▬▬▬▬ ▬▬▬▬▬ re displayed in white letters on a green awning over the front entrance of the apartment complex. The front door of Apartment ▬▬▬▬▬ s green with green numeral▬▬▬ ffixed to a white oval placard near the top center of the door in the District of Columbia, there is now being concealed property, namely a firearm and/or ammunition, paperwork and documentation related to the possession, acquisition, disposition, and maintenance of firearms, as well as ammunition magazines, ammunition boxes, holsters, ammunition pouches, firearm boxes, cleaning kits, ballistic vests, firearms parts, photographs of firearms, and accessories for firearms such as grips, scopes, and slings. In addition, there are concealed paperwork and documentation related to the identity of the possessors of such items and/or occupancy of the premises, which is __in violation of Title 22 of DC Code Sections 402 & 4504__ and as I am satisfied

(Alleged ground for seizure)

that there is probable cause to believe that the property so described is being concealed on the above designated ☐ person, ☐ premises, ☐ vehicle, ☐ object, and that the foregoing grounds for issuance of the warrant exist.

YOU ARE HEREBY AUTHORIZED within 10 days of the date of issuance of this warrant to search at any time of the day or night, the designated ☐ person, ☐ premises ☐ vehicle, ☐ object, for the property specified, and if the property be found there,

YOU ARE COMMANDED TO SEIZE IT, TO WRITE AND SUBSCRIBE in an inventory of the property seized, to leave a copy of this warrant and return, and to file a further copy of this warrant and return with the Court on the next Court day after its execution.

Issued this 5th day of _December_ , 2006.        _Bruce D. Beaudin_

                                        Judge, Superior Court of the District of Columbia

---

## RETURN

I received the above warrant on __DECEMBER  5__ , 2006 and have executed it as follows:

On __DECEMBER  6__ , 2006 at __6:55__ ☒ a.m. ☐ p.m., I searched the ☐ person, ☒ premises, ☐ vehicle, ☐ object, described in the warrant and I left a copy of the warrant and return with __FRANK BERNARD WALKER__ properly posted.

(name of the person searched or owner, occupant, custodian or person present at place of search)

The following is an inventory of the property taken pursuant to this warrant: _FIREAR__ _AMMUNITION,_ _AMMUNITION MAGAZINE, STUN GUN, MISC. DOCUMENTS CONCERNING OWNERSHIP OF RESIDENCE, FRAUDULENT IDENTIFICATION DOCUMENTS, FRAUDULENT VEHICLE TEMPORARY TAGS, MARIJUANA, ECSTASY PILLS._

---

This inventory was made in the presence of __VASAKA DUKE, OLIVER GREEN__

I swear that this is a true and detailed account of all property taken by me under this warrant.

                                        #2370  ATF

                                        Executing Officer

Subscribed and sworn to before me this 15th day of _December_ , 2006

                                        _Bruce D. Beaudin_

                                        Judge, Superior Court of the District of Columbia

Case: 2006 CRW5LD 003805

# BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES
## WASHINGTON, D.C.

### AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT FOR:

### APARTMENT ██
### WASHINGTON, D.C.

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

---

AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT FOR: ████████████
APARTMENT ████████████WASHINGTON, D.C. The premise ██████
████████APARTMENT ████ is described as a high-rise apartment complex located on
the west side of ████████████ at the corner of ████████████
████████Washington, DC. The words "████████████████████████" are
displayed in white letters on a green awning over the front entrance of the apartment
complex. The front door of APARTMENT ████ is green with green numerals ████
affixed to a white oval placard near the top center of the door. Your affiant submits that
the aforementioned location is the residence of FRANK BERNARD WALKER. Your
affiant, Aaron R. Ybarra, a Special Agent with the Bureau of Alcohol, Tobacco, Firearms
and Explosives, assigned to the Washington, D.C., High Intensity Drug Trafficking Area
Task Force, being duly sworn depose and state as follows:

### Affiant's Training and Experience

1. Your affiant in this matter is Special Agent Aaron R. Ybarra of the Bureau of Alcohol,
Tobacco, Firearms and Explosives (ATF). I have been a Special Agent with ATF since
July 2001. Since becoming a Special Agent with the ATF, I have taken part in numerous
federal, state and local firearm related investigations involving armed gangs, firearms
traffickers, armed robbery, felons and illegal aliens in possession of firearms and
ammunition, and the use of firearms in furtherance of drug trafficking crimes. I have
attended a number of schools and training venues hosted by ATF concerning firearms
and various techniques of investigating firearm related crime.

2. As a result of these firearm related investigations, your affiant has taken part in the
preparation, presentation and execution of over 100 search and arrest warrants in
Washington, DC, and the surrounding metropolitan area, which have resulted in the
recovery of firearms and firearm boxes, firearm magazines, firearm holsters, firearm
parts, firearm safes, firearm cleaning kits, ammunition and boxes of ammunition,
ammunition casings, ammunition pouches, ballistic vests, photographs of firearms and
individuals with firearms, and documentary evidence indicative of firearms possession
and violations.

*p 1 of 6*
*BDB*

3.  During the course of your affiant's professional experience and participation in the investigation of firearm offenses, I have had the opportunity to interview hundreds of defendants, witnesses, victims, confidential informants, and police officers regarding firearm related crime specifically within the District of Columbia.    Through these interviews and experience in investigating firearm related crime, I have learned that suspects who obtain firearms and ammunition illegally in Washington, DC, keep these items in order to commit further crimes, which include armed drug trafficking, robbery, burglary, carjacking, and assault, as well as other crimes against people and property.  I have learned that these suspects keep firearms and ammunition in order to protect the profits of their criminal activity, to include money derived from drug dealing, robbery or burglary; actual drugs (of any amount), jewelry, stolen cars, credit cards and other fraudulently obtained items.  Further, I have learned that suspects who commit crime with firearms keep firearms and ammunition to protect themselves from law enforcement, rival gang members and other individuals who may pose a threat to the safety of these suspects.    I have learned that suspects who obtain firearms and ammunition in Washington, DC, keep these items within their residences and/or vehicles, or within the residences of others in order to protect them from theft and to protect their illegal criminal profits which are stored within these residences and/or vehicles.  I have also learned that suspects who own or possess firearms and ammunition in Washington, DC, also keep other firearm related equipment, to include ammunition magazines, holsters, bullet proof vests, pistol grips, boxes, cleaning kits and paperwork relating to the acquisition and disposition of firearms.  I have learned that suspects keep firearms, ammunition and their accessories secreted within their residences and/or vehicles for extended periods of time due to the fact that it is illegal as well as difficult to obtain particular firearms and firearms related accessories, such as ammunition, within the District of Columbia.  Lastly, I have learned and experienced that suspects do not carry their entire inventory of ammunition or equipment, such as ammunition and ammunition magazines, while carrying their firearms on their person or in a vehicle, but will keep their available ammunition and magazines in their residence and/or vehicle for future use.  Generally, handgun ammunition is sold in boxes of 50 or 100 rounds, depending on the caliber of ammunition purchased.  Generally, handgun magazines do not hold exactly 50 or 100 rounds of ammunition but rather far less.  Therefore, there will be an excess of ammunition which may be stored in a location such as a residence and/or vehicle while an individual is carrying a fully or partially loaded firearm.

4.  From my experience as an ATF agent, I have learned that firearms and ammunition are not manufactured within the District of Columbia and therefore, must cross state lines and travel in interstate or foreign commerce prior to entering the District of Columbia.  Through my experience I have learned that many of the firearms recovered in Washington, DC, were purchased in Virginia, Maryland, or other "source" states such as Florida, North Carolina and Georgia.  A number of firearms recovered in Washington, DC, have been "straw purchased", which is defined as the acquisition of a firearm from a federally licensed dealer by an individual (the "straw purchaser"), done for the purpose of concealing the identity of the true intended receiver of the firearm.  The purchased firearms are then transported over state lines into the District of Columbia by the DC resident, the "straw purchaser" or another recruited person.  The firearms are then carried



and t ransported o n t heir p erson a nd/or i n t heir v ehicle a nd u sed i n t he c ommission o f crimes, then subsequently stored in the firearm possessor's residence and/or vehicle for extended periods of time. Oftentimes the "straw purchaser" will also purchase boxes of ammunition for the receiver of the firearm. In turn, the suspect will keep firearm boxes, ammunition boxes and paperwork relating to the acquisition of the firearm and/or ammunition in their residence and/or vehicles along with the firearm. Occasionally, the "straw purchaser" reports the purchased firearm stolen, thus distancing him or herself from criminal activity the true firearm possessor may engage in. Due to the close proximity of Virginia and Maryland to the District of Columbia, there is a constant flow of "straw purchased" firearms into Washington, D.C.

5. Your affiant has learned that some firearms entering Washington, D.C. have been stolen from gun stores or residences in other states during the commission of robberies or burglaries. Through my training and experience I have learned that suspects who acquire stolen firearms and ammunition from other states are prone to sell and/or trade them in Washington, D.C., due to the high demand for these items by the criminal element. Your affiant has also learned that individuals who obtain stolen firearms and/or ammunition, should they not sell and/or trade them soon after their receipt, may store these items in their residences and/or vehicles for extended periods of time for the same reasons noted in the previous paragraphs. Additionally, these suspects may attempt to remove or obliterate any identifying markings (such as serial number, make and model) of a firearm in order to limit the ability of law enforcement to determine the original or any subsequent purchaser or possessor of the firearm. As such, suspects may be more likely to hold onto such firearms and store them in their residences and/or vehicles, for such firearms are more valuable to the criminal element if law enforcement c annot trace or track the firearm's history and/or movement. Further, in Washington, D.C., stolen firearms and ammunition can be sold for higher prices or traded easily for such items as narcotics or other stolen merchandise

## Probable Cause

6. Since this affidavit is being submitted for the limited purpose of obtaining a search warrant for the target premises, it is not intended to include each and every fact observed by your affiant or known to the government. Your affiant has set forth only those facts necessary to support probable cause for this application. Facts not set forth herein are not being relied upon in reaching my conclusion that a search warrant should be issued. Nor do I request that this Court rely upon any facts not set forth herein in reviewing this affidavit in support of an application for a search warrant.

7. This affidavit is made in support of an application for a search warrant for the premises located at █████████████████ APARTMENT ██, ████████████████ WASHINGTON, D.C. On the basis of my familiarity with this investigation and the basis of other information that I have received and determined to be reliable, I allege the facts to show that there is probable cause to believe that articles constituting contraband, evidence, fruits, and instrumentalities of the following crimes: carrying a pistol without a license, in violation of District of Columbia Code, Title 22 Section 4504; and assault with



a deadly weapon – gun, in violation of District of Columbia Code, Title 22 Section 402; will be found in the residence of FRANK BERNARD WALKER, at ███████████████, APARTMENT ███████████████ WASHINGTON, D.C.

8. On November 30, 2006, members of the Washington, D.C. Metropolitan Police Department (MPD) received a radio run to respond to a 911 call placed from ███████ ██████████████, Washington, D.C. Upon arrival, MPD Officers documented statements and details made by a witness (W-1) concerning an alleged violation of District of Columbia firearm laws committed by FRANK BERNARD WALKER. W-1 stated that it is friends with (W-2). W-1 stated that W-2 is known to purchase and sell cars with FRANK BERNARD WALKER. W-1 advised MPD Officers that it and W-2 were meeting with WALKER at a gas station. W-1 stated that when WALKER arrived to the gas station, WALKER immediately jumped out of his car, which your affiant submits to be a 1998 navy blue Mercedes Benz E320, Vehicle Identification Number: WDBJH82F9WX009789, and pointed a hand gun at W-2 and stated, "Your time is up. I'm tired of your shit." A struggle between W-2 and WALKER ensued and ended with W-2 pushing WALKER away and fleeing the location on foot. W-1 stated that after this altercation, WALKER entered into his vehicle and drove away. W-1 described WALKER's vehicle as a navy blue 2007 BMW wagon with yellow dealer license plates. W-1 described WALKER as a black male, approximately 35-40 years of age, approximately 5'08" tall and 290 pounds, black hair and brown eyes. W-1 further stated that WALKER resides at "███████████located on███████████████Washington, D.C.

9. On December 1, 2006, your affiant reviewed surveillance footage of ███████ ████████Washington, D.C., during the time of the alleged assault with a deadly weapon - gun committed by FRANK BERNARD WALKER. This location is a Sunoco gasoline service station. A review of the aforementioned video surveillance captured footage of multiple individuals, which included W-1, running away from pump # 1. It appeared as if these individuals and other innocent bystanders were taking positions of cover and assuming defensive positions. Investigation has revealed that the vehicle driven by WALKER was located at pump #1 when the alleged violation occurred.

10. A query of District of Columbia Department of Motor Vehicles (DMV) records through the National Crime Information Center (NCIC) reports a District of Columbia driver's license issued to FRANK BERNARD WALKER, date of birth: ███████████of ██████████████████, ████████WASHINGTON, D.C.

11. On December 1, 2006, pursuant to an administrative subpoena issued by members of the Drug Enforcement Administration (DEA), investigators obtained and reviewed leasing documents concerning The Envoy apartment complex located at ███████████ ██████████████████████ WASHINGTON, D.C. These documents report that FRANK BERNARD WALKER currently leases the aforementioned apartment, as indicated by the leasing agreement which runs from May 1, 2006 to April 30, 2007. According to documents presented, WALKER previously resided in Apartment ███before transferring to APARTMENT ███. WALKER lists a

*p 4 of 6 BOB*



work phone number of <span>███</span>7103. WALKER also lists this number as a cellular number. While at the Envoy apartment complex, at approximately 3:30 PM, DEA SA Cindy Buskey went to **APARTMENT** <span>███</span> At this time, SA Buskey observed an individual, later identified by SA Buskey as FRANK BERNARD WALKER, walk to **APARTMENT** <span>███</span>and place a key into the door. Seconds later, SA Buskey heard the door slam shut.

12. DEA SA Buskey also went to the parking garage of this apartment complex. SA Buskey observed a 1998 navy blue Mercedes Benz E320 station wagon, Vehicle Identification Number: WDBJH82F9WX009789, with yellow District of Columbia dealer's license plate's DLR-5017. This vehicle was located in parking space #105 of the parking garage. Further review of leasing documents reported that FRANK BERNARD WALKER was issued a parking permit and assigned parking space #105.

13. A query of District of Columbia DMV records concerning District of Columbia dealer's license plate's DLR-5017 reports license plate DLR-5017 as an active dealer license plate associated with K & F Auto Sales of 2800 10th Street, Northeast, Washington, D.C.   Further review of these records reports FRANK BERNARD WALKER as the owner of this business. DMV records list the phone number for this business as 2<span>███</span>7103.   DEA SA Buskey also observed this number on a billboard bearing the name K & F Auto Sales located outside of the business. The phone number <span>███</span>7103 is the same number provided by WALKER as a work and cellular number on leasing documents for <span>███</span>, A PARTMENT<span>███</span>, WASHINGTON, D.C.

14.   On December 4, 2006, your affiant checked with the Metropolitan Police Department's Firearms Registration Unit and found that no one residing at <span>███</span>, **APARTMENT** <span>███</span> WASHINGTON, D.C., possesses firearms or ammunition registration certificates, nor were any firearms or ammunition registered at this address. In addition, the Firearms Registration Unit found no firearm or ammunition registration certificates issued to FRANK BERNARD WALKER.

**Conclusion**

15. Based on the aforementioned information and your affiant's training and experience in firearm related investigations, your affiant believes that, probable cause will exist that articles constituting contraband, evidence, fruits, and instrumentalities of the following crimes: c arrying a p istol w ithout a l icense, i n v iolation o f D istrict o f C olumbia C ode, Title 22 Section 4504; and assault with a deadly weapon – gun, in violation of District of Columbia Code, Title 22 Section 402; will be found in the residence of FRANK BERNARD WALKER located at <span>███</span>th <span>███</span> **APARTMENT** <span>███</span> <span>███</span>, WASHINGTON, D.C. There also may be concealed in this location ammunition, paperwork and documentation related to the possession, acquisition, disposition, and maintenance of firearms, as well as ammunition magazines, ammunition boxes, holsters, ammunition pouches, firearm boxes, cleaning kits, ballistic vests, firearms parts, photographs of firearms, and accessories for firearms such as grips,

*p 5 of 6*
*BDB*

scopes, and slings. In addition, I believe that there is concealed paperwork and documentation related to the identity of the possessors of such items and/or occupancy of the premises and I therefore respectfully request a search warrant be issued for the premises, and locked boxes within the premises, of ▮▮▮▮▮▮▮▮▮▮ **APARTMENT** ▮▮▮▮▮▮▮▮▮▮▮ **WASHINGTON, D.C.,** authorizing the seizure of the aforementioned items and any additional contraband discovered within.

Approved
Jerry R Rydele
12/5/06

Aaron R. Ybarra
Special Agent
Bureau of Alcohol, Tobacco, Firearms & Explosives

Sworn to and subscribed before me this ___5th___ day of December 2006.

_Bruce D. Beaudin_
District of Columbia Superior Court Judge

0.6 06. Bull R 12/15/2006 1:09:47 PM

# ATTACHMENT 'D'

# SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## SEARCH WARRANT

TO: _____ **CHIEF OF POLICE OR ANY OTHER LAW ENFORCEMENT OFFICER** _____
(Specific law Enforcement Officer or Classification of Officer of the Metropolitan Police Department or other Authorized Agency)

AFFIDAVIT, herewith attached, having been made before me by Detective Daniel Straub, Badge D-305 that he has probable cause to believe that on the __premises__ known as as described more fully in the Affidavit in Support of a D.C. Superior Court Search Warrant and Attachment A, which is incorporated herein by reference in the District of Columbia, there is now being concealed property, namely Any and all materials, documents, articles, and equipment consistent with the production or re-production of counterfeit driver's licenses and related DMV titles, license plates, registration documents, and temporary tags, as well as any bills of sale, customer records, vehicle logs, documents reflecting any transfer of property and or money , and ledgers (See also Attachment B); NOTEBOOKS, FINANCIAL INSTRUMENTS, AND ACCOUNTING BOOKS. INCORPORATED HEREIN BY REFERENCE

WHICH IS __ and as I am satisfied that there is probable cause to believe that the property so described is being concealed on the above designated __premises__ and that the foregoing grounds for issuance of the warrant exist.

YOU ARE HEREBY AUTHORIZED within 10 days of the date of issuance of this warrant to search in the daytime/at any time of the day or night, the designated __premises__ for the property specified, and if the property be found there

YOU ARE COMMANDED TO SEIZE IT, TO WRITE AND SUBSCRIBE in an inventory of the property seized, to leave a copy of this warrant and return, and to file a further copy of this warrant and return with the Court on the next Court day after its execution.

Issued this 6th day of December 2006 _____ LEIBOVITZ, J.
Judge, Superior Court of the District of Columbia

---

## RETURN

I received the above warrant on DEC 6TH 2006 and have executed it as follows: On DEC 6TH 2006 at 10 PM., I searched the __premises__ described in the warrant and I left a copy of the warrant and return with MR. KNOX COLE properly posted.
(name of the person searched or owner, occupant, custodian or person present at place of search)

The following is an inventory of the property taken pursuant to this warrant:

PAPERS, PHOTOGRAPHS, DOCUMENTS, TEMPORARY TAG, ASSORTED RECORDS

This inventory was made in the presence of DET. C. CASIANO

I swear that this is a true and detailed account of all property taken by me under this warrant.

Daniel J. Straub
Executing Officer

Subscribed and sworn to before me this 14th day of December 2006

Mary Ellen Abrecht
Judge, Superior Court of the District of Columbia

## AFFIDAVIT
## IN SUPPORT OF A SEARCH WARRANT

1.      I, DANIEL STRAUB, being a duly sworn member of the Metropolitan Police Department (MPD), Centralized Auto Theft Section, Washington, District of Columbia (DC), do affirm that I have been employed with the MPD for more than twenty-four (24) years, having worked the last nineteen (19) years as an investigator and then detective directly assigned to the Centralized Auto Theft Section, Special Investigations Branch.  During my years at MPD I have participated in the execution of numerous search warrants.  I have also attended many vehicle auto theft investigative seminars in the United States and Canada.  Many of these conferences have included sessions associated with vehicle title documents, fraud and the schemes affiliated with the theft, sale, manufacture and exportation of automobiles.  I have also been a member of the International Association of Auto Theft Investigators (IATTI) and serve on the Washington Metropolitan Area Council of Governments (COG), Chiefs of Police Auto Theft Sub-Committee.

2.      During the course of my investigative experience, I have worked with federal, state and local law enforcement agents in the field of vehicle theft.  Since 1995, I have provided court testimony as an expert witness in this area for the United States Attorney's Office for the District of Columbia.  Your affiant has also had occasion to investigate criminal matters within the DC Department of Motor Vehicles (DMV), particularly those that have evolved from fraudulently titled automobiles.  I am familiar with the DC DMV, its operations, organization, the operation of its (car) dealer office, the procedures outlined for car dealers who are licensed to operate within the District of Columbia, and the documents, forms and procedures associated with the titling and registration of motor vehicles.

3.      Your affiant is also versed in the fraudulent use and counterfeit production of documents that are often linked with the individuals who perpetuate the mobility of unregistered and sometimes stolen motor vehicles.  These documents have included, but are not limited to temporary use tags, license plates (whether of metal or other construction), that are designed to appear authentic, but are color reproductions or otherwise crafted to appear genuine.

4.      Affiant makes this affidavit in support of an application for the issuance of a search warrant to search for fruits, evidence and instrumentalities of criminal activity located at the following address associated with a car dealer business, owned by Frank Walker, hereinafter identified as K & F Auto Sales, Inc. t/a Walker Enterprises, located at 2800 10th Street, Northeast, Washington, D.C. 20009.

Descriptions of the aforementioned address are contained in Attachment A and a list of the items to be seized are described in Attachment B, all of which are incorporated herein by reference.  Your Affiant believes that probable cause exists to believe that evidence, fruits and instrumentalities of violations of federal criminal law may be found at the above location, specifically, materials used in the production of

or completed fraudulent driver's licenses, vehicle registration documents and titles in violation of D.C. Code 22 Section 3221(a) (Fraud in the First Degree).

5.     On June 17, 2000, undercover (UC) personnel from the Metropolitan Police Department ("MPD"), met an individual at ████████████ in ████████ Washington, D.C., who came to be known as "Flip", AKA Frank Walker, a black male, date of birth ████████ 1972, who resided within an apartment building at ████████████, Washington, D.C. "Flip" sold the MPD UC counterfeit temporary tags for $150.00 in United States currency. "Flip" transferred possession of the counterfeit tags to the MPD UC inside the pages of a folded newspaper. He then left the scene operating a Mercedes Benz sedan that was registered in his own name to the 2400 16th Street, NW, Washington, D.C. address.

6.     A short time after the initial purchase of counterfeit tags, the UC once again met with "Flip". At that meeting, another set of counterfeit temporary tags were purchased in a similar manner while in the District of Columbia.

7.     On December 6, 2006, law enforcement personnel looking into an apparent unrelated criminal infraction, obtained and executed a search warrant of Frank Walker's efficiency apartment, located at ████████████ Washington, D.C., apartment number ████. As a result of this search, criminal investigators seized several items to include:

Seventy-one (71) sets of [counterfeit] Virginia temporary tags with corresponding registrations, all but three wrapped inside newspaper;

Four (4) suspected counterfeit driver's licenses, one each from Pennsylvania, Florida, Ohio, and the District of Columbia;

Two (2) Maryland temporary tags, exhibiting different numbers;

Twenty-three (23) blank Virginia registration documents bearing the imprinted names of Woodbridge Public Auto Auction;

Thirty-one (31) Virginia blank registration documents bearing the imprinted name: King's Auto Inc. located at 1310 King Street, Alexandria VA 22314;

Nine (9) Virginia re-assignment forms, all bearing the same serial number;

Three (3) packs of "Trim Brite" prisma silver-colored tape;

Eighty-five (85) blank, serialized Maryland temporary registrations;

Sixteen (16) sheets containing multiple adhesive strips with Maryland "AAMVA" hologram;

Five (5) sheets containing multiple adhesive strips with the "State of Maryland" holographic logo;

One (1) DC Department of Consumer and Regulatory Affairs identification card for motor vehicle sales license titled to K & F Auto Sales, 2800 10th Street. NE in the name of Amir M. Hassanzaden;

One (1) auction access card number issued to Amir Hassanzadeh of K & F Auto Sales, Inc., 2800 10th Street, NE, Washington, DC 20018;

Fifteen (15) yellow and blue color photocopies, actual size, of DC dealer license plates including two of DLR-5017.

One (1) paper cutting board;

One (1) two-hole punch;

One (1) pair of scissors; and

One (1) single hand-held punch.

*OBSERVED WITHIN THE APARTMENT, BUT NOT SEIZED, WAS A COLOR FAX/ PRINTER/SCANNER/COPY MACHINE, SUITABLE FOR PRODUCING ITEMS (TEMP TAGS) CONFISCATED. WERE TWO (2) LAPTOPS*

8. Investigators also searched a Mercedes Benz station wagon parked nearby that had previously been observed being operated by Frank Walker. That vehicle was displaying DC dealer tag DLR-5017. That dealer tag was issued to Walker's business, K & F Auto Sales, Inc at 2800 10th Street, Northeast, Washington, D.C. Upon examination, that vehicle contained, in part:

Upon the vehicle's rear seat:

Twenty (20) sets of *counterfeit* Maryland temporary tags wrapped in individual newspapers with accompanying blank registration documents;

Two (2) sets of *counterfeit* Virginia temp tags with accompanying registration documents displaying the name: King's Auto;

One (1) black Sharpie marker;
One (1) "B Paint Stik" marker;
Two (2) blank Maryland temporary registration certificates, and
One set of two (2) Virginia temporary tags.

Inside the car's glove compartment:
        Two (2) Maryland driver's licenses;
        One (1) Maryland commercial driver's license;
        One (1) Virginia driver's license.
        Two (2) passport-type color photographs of a male subject that is identical to the male depicted in one of the two Maryland driver's licenses above.

YOUR AFFIANT HAS PARTICIPATED IN NUMEROUS LAW ENFORCEMENT TRAINING CLASSES THAT HAVE INCORPORATED INSTRUCTION ON DETECTING AND INVESTIGATING THE PRODUCTION OF COUNTERFEIT TEMPORARY LICENSE PLATES. SINCE 1981, YOUR AFFIANT HAS INTERCEPTED HUNDREDS OF UNREGISTERED AND STOLEN VEHICLES THAT ARE DISPLAYING COUNTERFEIT TEMPORARY TAGS. ALL OF THE LISTED/DESCRIBED TEMPORARY TAGS

*WUB LEIBOWITZ L.J. 12/6/06    9:10 P 12/6/06*

_WITH EQUIPMENT USED IN THE_
_PRODUCTION OF COUNTERFEIT TEMP TAGS AND TITLES AS ..._
_USED IN THEIR PRODUCTION ARE CONSISTENT WITH THOSE_
_ARTICLES SEIZED OR OBSERVED WITHIN MR. WALKER'S APARTMENT._

8.  Based upon business records on file with the District of Columbia Department of Motor Vehicles, Dealer Section, K & F Auto Sales, Inc. is located at ████████████ ████████ ashington, District of Columbia.  The dealership trade name is Walker Enterprises and is owned by Frank Walker, Social Security Number ████ 8327 of (Residential Address) ██████████████████████, Washington, D.C.  _PAST_
_EXPERIENCE HAS INDICATES THAT A BUSINESS OWNER WILL_
_OFTEN BLEND PERSONAL AND WORK ITEMS AT THEIR PLACE OF EMPLOYMENT._

9.  The dealer's license issued to **Frank Walker** by the DC Office of Consumer and Regulatory Affairs was issued on **February 3, 2005.**

10. Based upon these facts, it is the **affiant's** assessment that there is probable cause to believe that materials consistent with those that were discovered within the residential dwelling belonging to Frank **Walker** and are associated with the sale, registration and titling of motor vehicles **may** also be housed within the confines of the owner's business; and that known records of apparent clients, and financial notations **may** be located at ████████████████████ n Washington, D.C.  This affidavit seeks authorization for a search **and** seizure warrant for the given location described in Attachment A on the grounds that there is probable cause to believe that they contain evidence, fruits and instrumentalities of violations of the laws of the District of Columbia.

_Approved:_
_RLL & T__ 12-6-06

_Daniel D. Straub_
DETECTIVE DANIEL STRAUB
METROPOLITAN POLICE DEPARTMENT
WASHINGTON, D.C.

## ATTACHMENT A
(Description of Site to Be Searched)

████████████ Washington, District of Columbia, is a business property situated on the northwest corner of ████████████████████ Washington, D.C. with a zip code of 20009. The one-story structure is constructed primarily of gray-colored brick with the numerals '████ appearing in black atop a gray-colored attached to the building's facade alongside the entrance doorway. The building appears to house three (3) separate businesses, but no distinct border, fence line or lines of demarcation that define where one business ends and the other begins.

A placard attached to the south side of the building bears the name K & F Auto Sales, Inc. and phone numbers ████████ 7103 and ██████████ 6135. A wooden bay door bears the name Paul's Auto Repairs. A cage-covered, side entry door has a sign hanging over its entryway displaying M & M Auto Body in red letters on a white placard with the phone number ████████ 0970. When called, a recorded voice message acknowledges that the caller has reached "M & M Auto Body" and "K & F Auto Sales". To the right of this entrance door, there is a single white-colored bay door.

The business office that is reportedly affiliated with K & F Auto Sales, Inc. reportedly lies inside an interior office that comprises M & M Auto Body. All three businesses apparently operate out of the same structure, but M & M Auto Body and Paul's Auto Repair are outside the realm of this search warrant.

Approved: ████████

12-6-06

## SEARCH WARRANT ATTACHMENT B
### (Items To Be Seized)

1. Any and all materials, documents, articles, and equipment consistent with the production or re-production of counterfeit driver's licenses and related motor vehicle titles, license plates, registration documents, temporary tags, any bills of sale, customer records, vehicle logs, documents reflecting any transfer of property and or money , and ledgers, notebooks, financial instruments, and accounting books.

Approved: *[signature]*

12-6-06

**Attachment 'E'**
**<u>Items to be Seized</u>**

1.  Any and all receipts, notebooks, ledgers, accounting books, money orders, electronic wire transfer documentation, cashiers checks and traveler's checks.

2.  Any and all bank statements, records, documentation of bank accounts (closed or in use), deposit slips, withdrawal slips, passbooks, checkbooks, check registers, investment statements, credit cards, credit card accounts in the name of Frank Walker or any other name, stock or mutual fund purchases, statement or receipts, currency, automatic teller machine (ATM) receipts and electronic money transfers.

3.  Any and all documentation pertaining to the sale, purchase, trade or possession of any motor vehicle.

4.  Any and all telephone and pager records to include, but not limited to, billing statements, toll records, air time records, and cellular or mobile telephone billing statements, caller identification logs.

5.  Any and all documents relating to the identity of co-conspirators or clients, including, but not limited to, address, phone books, Rolodexes, personal telephone directories, photographs, video, audio, CD, disk or DVD's, correspondence between co-conspirators, computer files and other electronic data storage.

6.  Any and all items either forged or fraudulently obtained instruments or instrumentalities used to produce the same, including but not limited to, drivers and non-drivers licenses, camera copy document forms, DMV registration certificates, registration license tags, digital or Polaroid camera(s), any film, decals for license plates and any lamination equipment.

7.  Computer equipment, including computer hardware, computer software, scanners or printers, computer or electronic storage media, computer disks, and computer printouts. The search procedure for the electronic data contained in computers or operating software or memory devices, whether performed on site or in a laboratory, or other controlled environment, will include the following techniques:

    a)  surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain a pertinent file);

    b)  "opening" or cursorily looking at the first few "pages" of such files in order to determine their precise contents;

    c)  "scanning" storage areas for deliberately hidden files; and

d) Performing key word searches through all electronic storage areas to determine the existence of stored records relating to customers, clients or other associates.